NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2025 IL App (4th) 241576-U

NOS. 4-24-1576, 4-24-1577 cons.

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
May 12, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* G.P., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Sangamon County |
| Petitioner-Appellee, | ) | Nos. 22JA89 |
| v.    (No. 4-24-1576) | ) | 22JA90 |
| Brett P., | ) | |
| Respondent-Appellant). | ) | |
| _____ | ) | |
| | ) | |
| *In re* M.P., a Minor | ) | |
| | ) | |
| (The People of the State of Illinois, | ) | |
| Petitioner-Appellee, | ) | |
| v.    (No. 4-24-1577) | ) | Honorable |
| Brett P., | ) | Karen S. Tharp, |
| Respondent-Appellant). | ) | Judge Presiding. |

JUSTICE STEIGMANN delivered the judgment of the court.
Justices Lannerd and Knecht concurred in the judgment.

**ORDER**

¶ 1   *Held:*   The appellate court affirmed the trial court's termination of respondent's parental
rights.

¶ 2        Respondent, Brett P., is the father of G.P. (born September 2021) and M.P. (born

June 2020). In October 2024, in proceedings involving both children, the trial court found

respondent was an unfit parent, and in December 2024, it found termination of respondent's

parental rights would be in the minor children's best interests.

¶ 3        Respondent appeals, arguing that the trial court's (1) unfitness and (2) best

interests findings were against the manifest weight of the evidence. We disagree and affirm.

¶ 4                                      I. BACKGROUND

¶ 5                          A. Procedural History Regarding G.P. and M.P.

¶ 6          In September 2021, Brenna F., G.P. and M.P.'s mother (who is not a party to this appeal), gave birth to G.P. At the time, M.P. was about 15 months old. Brenna and G.P. both tested positive for cocaine. Brenna admitted to using cocaine during her pregnancy and stated that she was receiving methadone treatment. Two days later, Brenna again tested positive for cocaine. Four days later, she tested positive for cocaine and heroin. In December 2021, the Illinois Department of Children and Family Services (DCFS) opened an intact case and began working with Brenna regarding her substance abuse issues. In January 2022, Brenna tested positive for 6-monacetylmorphine, which was consistent with heroin use. In February 2022, Brenna tested positive for opiates—morphine and methadone.

¶ 7          In April 2022, the State filed petitions for adjudication of wardship as to G.P. and M.P., alleging the children were neglected in that (1) they lived in an environment injurious to their welfare, as evidenced by respondent's and Brenna's "drug use," and (2) they were not receiving the proper care necessary for their well-being, as evidenced by Brenna's "failure to cooperate fully with intact services." See 705 ILCS 405/2-3(1)(a), (b) (West 2022).

¶ 8          On the same day the petitions were filed, the trial court conducted a shelter care hearing and placed temporary custody of G.P. and M.P. with the guardianship administrator of DCFS.

¶ 9          In July 2022, the trial court conducted an adjudicatory hearing regarding G.P. and M.P. The court found that the children were neglected minors as alleged in the petitions, noting, "[G.P. was] born substance exposed, intact services for mother offered, mother did not cooperate

with services."

¶ 10      In August 2022, the trial court conducted a dispositional hearing regarding G.P. and M.P., and at the conclusion, it entered a written order finding (1) respondent unfit for reasons other than financial circumstances alone to care for, protect, train, educate, supervise, or discipline the minors and (2) it was in the best interests of the minors to be made wards of the court. The court noted that respondent and Brenna needed to cooperate with services or they risked termination of their parental rights.

¶ 11                      B. The Termination Proceedings

¶ 12      In March 2024, the State filed petitions to terminate respondent's parental rights as to each of the minor children. In August 2024, the State filed amended petitions. The State alleged respondent was an unfit parent within the meaning of the Adoption Act (750 ILCS 50/1 *et seq.* (West 2022)) because he failed to (1) maintain a reasonable degree of interest, concern, or responsibility as to the children's welfare, (2) make reasonable efforts to correct the conditions that were the bases for the children's removal during the nine-month periods of (a) July 2022 to April 2023, (b) April 2023 to January 2024, and (c) November 2023 to August 2024, and (3) make reasonable progress toward the return of the children within those same nine-month periods. See *id.* § 1(D)(b), (m)(i)-(ii).

¶ 13      Over two days in October and December 2024, the trial court conducted a bifurcated termination hearing on the State's petitions.

¶ 14                      1. *The Fitness Portion of the Termination Proceedings*

¶ 15      In October 2024, the trial court conducted the fitness portion of the termination proceedings. At the beginning of the hearing, the court stated that it was taking judicial notice of the adjudicatory, dispositional, and shelter care orders.

¶ 16                              a. Melissa Pease

¶ 17        Melissa Pease testified that she worked for the Family Service Center as a foster care supervisor. In April 2023, she supervised the caseworker working on G.P.'s and M.P.'s cases and took over the cases in June 2023. She testified that the cases first came into the system in September 2021, when G.B. was born "substance[ ]exposed" to cocaine. Neither G.P. nor M.P. was taken into custody at that time, but Brenna did not cooperate with DCFS, and the children were taken into protective custody in December 2021. Respondent was arrested for a domestic violence incident against Brenna before or around the time the minors entered care.

¶ 18        Pease testified that the service plan required respondent to engage in services pertaining to domestic violence, anger management, substance abuse, parenting, and mental health services. Substance abuse was the main concern for both respondent and Brenna. In December 2021, and throughout the length of the case, both respondent and Brenna were in an outpatient methadone treatment program, which provided them with small amounts of methadone, an orally administered drug meant to prevent opioid withdrawal and prevent relapse. Pease explained that the primary goal of methadone treatment was to wean the recipient off the drug, but methadone withdrawal could be as bad if not worse than heroin withdrawal symptoms. Both respondent and Brenna were also attending Narcotics Anonymous (NA) and Alcoholics Anonymous (AA).

¶ 19        In April 2023, respondent was initially rated satisfactory for his engagement with his service plan, but because he was living with Brenna, who had tested positive for illegal substances, he was ultimately rated unsatisfactory.

¶ 20        Pease testified that in July 2023, the parents were allowed to have unsupervised visits with the children. The daycare that G.P. went to reported to Pease that following visits with

respondent and Brenna, G.P. would smell of cigarette smoke, which was concerning because G.P. had severe allergies to cigarette smoke and exposure would require breathing treatments. Pease testified that respondent was a smoker, but Pease noted that during random "pop-ins" to respondent's home, Pease never smelled cigarette smoke.

¶ 21 In August 2023, during a "pop-in," Pease asked respondent and Brenna to complete an oral drug test. Brenna went to the bathroom before taking the test, and respondent took the test in front of Pease. Brenna's test was positive for alcohol, but Pease did not believe that Brenna had been drinking. She acknowledged that Brenna might have been trying to fool the test with mouthwash. Brenna also tested positive for opiates, and she admitted that she had already tested that week and relapsed.

¶ 22 Pease's impression was that Brenna did not believe she would be tested again that week. Respondent's test was positive only for methadone. After that visit, DCFS stopped allowing unsupervised visits with the children.

¶ 23 In September 2023, Pease requested that respondent and Brenna take hair follicle drug tests. Pease explained that the hair follicle test could detect drug use as far back as around 90 days prior to testing. Brenna tested negative, but the lab did not test for methadone. Respondent's hair follicle test was positive for morphine, codeine, and heroin. When confronted with the hair follicle test results, he admitted to having relapsed.

¶ 24 Pease testified that respondent had been required to take 12 drug tests before she administered the hair follicle test. He did not show up to one of the tests, six of them were "adulterated," and the others came back negative.

¶ 25 Pease explained that the lab that tested the urine provided by respondent and Brenna told her "adulterated" meant that the urine had been diluted in some way. According to

the lab, one or two adulterated results were not a big deal, but trends of adulterated urine results could be troubling. The lab told Pease that a test could be adulterated by taking water pills or drinking excessive amounts of water.

¶ 26        Pease spoke to respondent and Brenna about the adulterated tests, and Brenna showed medical documentation that her hepatitis C could cause the urine to appear adulterated. Although Pease did not know if respondent had hepatitis C, she noted that he did not give that diagnosis as a reason for his tests being adulterated.

¶ 27        Pease found the hair follicle test result particularly worrisome because of Brenna's testing positive for opioids earlier that summer. Pease was "concerned that they could possibly be using but [have] just enough time to be able to complete a drug test and then, *** be able to have a clean system for the drug test."

¶ 28        During this time and throughout the case, respondent maintained employment and appropriate housing.

¶ 29        Pease stated that the primary concern for both respondent and Brenna was to maintain sobriety. They each indicated that they had found new motivation and were willing to try different treatments.

¶ 30        Pease further testified as follows:

> "Unfortunately, we had a lot of plans, and we did have early on, ***, between October [2023] and January [2024], we had a lot of meetings. We met a lot. At first when I got the case, [respondent] didn't have a phone or we didn't have a number for him, so I was communicating a lot through Brenna. But then I got [respondent's] number, and we were in a group chat, and we communicated a lot. Built *** ideas of what we could by just being in contact with them, trying to

hold them accountable which they said they wanted. I started testing them twice a week, one oral, one urine, and then obviously the hair follicles every 90 days."

¶ 31    In January 2024, Brenna took an oral drug test and tested positive for amphetamines. She told Pease that amphetamines were not her drug of choice and took another test that was also positive for amphetamines.

¶ 32    Later that month, at a permanency review hearing, the trial court ordered respondent and Brenna to take a urine test. Respondent tested positive for methadone, and Brenna tested positive for fentanyl. She then admitted to relapsing.

¶ 33    Later in January 2024, Pease had the DCFS staff nurse explain at a meeting the dangers of fentanyl to respondent and Brenna, and from then on, they were required to test before visits with the children.

¶ 34    Pease spoke with respondent and Brenna and informed them that (1) their current methods of treatment were not working and (2) they needed to do something different. At that time, Pease still believed that if they got treatment, they could turn things around, but that did not happen.

¶ 35    In February 2024, respondent and Brenna took their last drug test and both tested positive for fentanyl. Respondent also tested positive for "heroin and like opiates, codeine, morphine, which is the breakdown for heroin." This was the last test because once respondent and Brenna obtained "a Primed for Life Advocate," Rachel Wilson, Pease lost most communication with them.

¶ 36    When asked what barriers to treatment respondent and Brenna expressed, Pease testified as follows:

"So once [respondent] tested, started testing positive and we were talking

about both of them going to inpatient, Brenna had actually done two or three days in the hospital for an assisted detox, but she did leave that program. And we talked about doing the inpatient for both of them because we thought it was necessary."

¶ 37    Around January or February 2024, respondent took two weeks off work to admit himself to an inpatient treatment program in order to wean off the methadone and be placed on a Suboxone-based treatment, which could not be done without first weaning off of methadone. However, respondent did not go and "said there wasn't [*sic*] beds open."

¶ 38    On cross-examination, Pease acknowledged that respondent and Brenna had engaged with their services but stated they had continually failed to maintain sobriety. The closest respondent and Brenna were to the return of the children was the one month they had unsupervised visits in July 2023. After that, things never got better. Pease did not believe that more time would help respondent and Brenna with their addiction. She stated that more time would serve only to drag the process out.

¶ 39                                    b. Respondent

¶ 40    Respondent testified that he lived in Springfield, Illinois, and worked at 1 Stop Auto Shop in Sherman, Illinois, for about three years. Before that he had worked at Hiller Automotive for about five years. He has four children, including G.P. and M.P. The other two were 17 and 15 years old. During the life of the case, he had three caseworkers, and the current caseworker was Pease.

¶ 41    The first caseworker "didn't like his job," he never told them what to do, and respondent could not get in touch with him. The second caseworker was better, but the changes in caseworkers made it difficult to start services. Respondent completed parenting, domestic

violence, and anger management classes. He also was participating in individual counseling. Respondent acknowledged that substance abuse had always been an issue for him since he was a teenager. In April 2016, he went to inpatient rehab. Since then, he had multiple relapses and had not attempted impatient rehab again.

¶ 42　　　Respondent testified that since the case began, he had frequently attended NA and AA meetings. He was at that time engaged in an outpatient substance abuse program, taking methadone for two and a half years, with the goal to eventually taper off the methadone. Respondent explained how the methadone treatment program worked:

> " [I]t's just like any opiate, if you take them for too long when you stop taking them your body goes through a physical sickness, which is almost impossible to function when you don't have it.
>
> So, the Methadone is just a liquid that you drink that is to try to get rid of that *** you not feeling well.
>
> And they only give you 30 milligrams. It's like the state's law that they can only give you a certain amount. So usually the first couple of days you're on it, you still feel sick. They up the dose until you start to feel normal. And once they do that, you stay on that dose. And then you try to taper off of it so you can get off of it."

¶ 43　　　Respondent stated that the last time he relapsed was in March 2024. To avoid additional relapses, respondent maintained contact with a support group, which consisted of Brenna, his mother, his brother, his counselor, and his acquaintances at NA and AA. He also continued to submit to random drug drops.

¶ 44　　　Before seeing his children at visits, respondent and Brenna were required to

submit to a drug test. Although respondent and Brenna never missed a visit with the children, the visits had been reduced in frequency to once a month.

¶ 45    Respondent further testified that he had a good relationship with his children and nothing was being asked of him that he was not doing. When he relapsed seven months ago, respondent reached out to let Pease know what had happened. He relapsed because he was attempting to get off of methadone on his own. He became very sick, and instead of going to the emergency room, he purchased heroin and used it to relieve his withdrawal symptoms.

¶ 46    Respondent acknowledged that there were times that his urine for drug tests was diluted or adulterated. He acknowledged that despite attending NA and AA, he did not have a sponsor because he had not found someone with whom he really connected. Also, he had not tapered off the methadone because he did not feel mentally strong enough. Respondent said he would always be an addict and could not guarantee he would never take drugs again.

¶ 47    c. The Trial Court's Parental Fitness Findings

¶ 48    The trial court concluded that the State had proven by clear and convincing evidence all the grounds for unfitness in the petition to terminate parental rights.

¶ 49    The trial court explained its ruling as follows:

"The allegations that the State has in their amended motion *** included failed to maintain a reasonable degree of interest, concern, or responsibility. This is in the disjunctive but even so, throughout this case it started because of drugs and we're still in that position now.

[Respondent is] still in outpatient after a long period of time. But we still have a situation where throughout this case, both parents, not just one, both parents have relapsed. Most of the time no one ever said anything. They waited

until they were caught. So—and again, to be in this position—and at the time Ms. Pease testified in October we had been in this case a thousand days. So now we're even just past that thousand days.

To be in this position, I cannot say that the parents have demonstrated a reasonable degree of interest, concern, and responsibility, and I stress responsibility, as to the minors' welfare. We've been in this case too long and we're dealing with the same issues.

It's one thing to say; we'll do anything, we'll do anything, we'll do anything. Even Ms. Pease stated in January they were saying the right things and seemed motivated, but nothing ever came from that. We're hearing the same thing today. However, when it counted, when the Court really needed to see what they were going to do. They were given options. They were told Gateway had openings. They were told to go do hair follicles. No, I don't want to stress about it. It won't make any difference anyway.

Through that length of time ***: I do find that State has shown by clear and convincing evidence that the parents did not maintain a reasonable degree of interest, concern, and I stress responsibility as to the children's welfare."

¶ 50 Regarding the time period of July 2022 to April 2023, the trial court noted that respondent was still in a relationship with Brenna, who was testing positive for drug use. The court stated the following:

"In April of 2023, given the situation, could I have returned the children to their care? *** Efforts were made, perhaps, during that time period. I will say that efforts were made, other classes were done. But can I say that they made

reasonable progress towards having the children returned to their care within that nine-month time period, I can't say that. One parent was using drugs. The other was still in a relationship [and] living with that individual who was using illegal drugs. I could not have returned the children to their care in that [nine-month] timeframe."

¶ 51　　　　Regarding the time period of April 2023 to January 2024, the trial court noted that both parents tested positive during that time. "So again, [substance abuse] was still an issue. We still hadn't conquered the issue. We still hadn't come to a place where I can say we're good. We can place these children back." Accordingly, the court found that the State had shown by clear and convincing evidence that the parents did not make reasonable progress or reasonable efforts.

¶ 52　　　　Regarding the time period of November 2023 to August 2024, the trial court stated it was "kind of the same situation." Both parents tested positive in that time frame. "We have both parents given an option of Gateway inpatient [treatment]. They're told there's beds, that didn't happen. They're given an option of doing hair follicle tests, they didn't utilize those things." The court found that respondent did not make reasonable progress or efforts during this time period.

¶ 53　　　　The trial court did find that the parents made reasonable efforts during the first time period but not during all the others.

¶ 54　　　　　　　　2. *The Best-Interest Portion of Termination Proceedings*

¶ 55　　　　Immediately after finishing the fitness portion of the proceedings, the trial court conducted the hearing on the best-interests portion of the termination proceedings, which proceeded for the remainder of the October 2024 hearing and resumed on a second day in December 2024. At the beginning of the best-interests portion of the hearing, at the State's

request, the court took judicial notice of the evidence presented at the fitness portion of the termination proceedings.

¶ 56                                                    a. Pease

¶ 57          Pease testified that she was currently the caseworker for G.P. and M.P. and that G.P. and M.P. were three and four years old, respectively. When the children came into care in April 2022, they were five or six months old and two years old, respectively. G.P. had hepatitis C and required ongoing treatment. M.P. had hepatitis C at one point but subsequently tested negative for the disease. The minors were originally placed separately, although each was placed with a sister of Brenna—namely, M.P. was placed with Erin C., and G.P. was placed with Christy S. However, they were subsequently removed from those placements.

¶ 58          In May 2022, G.P. was placed with Kaylee P., a foster care provider licensed by DCFS. In July 2022, M.P. was placed with Jennifer M., Erin's friend, who had been caring for M.P. at times to give Erin a respite.

¶ 59          Pease explained why M.P. was moved from her original placement, stating as follows:

          "So I was not the caseworker at the time. Just based on the notes in the
          case file, [M.P.] was with Billy and Erin [C.] They had a young child, two
          children, an infant. And [M.P.] was having behaviors that were causing their
          toddler, who was similar in age to [M.P.], to have behaviors. And [Erin] couldn't
          handle *** the behaviors that [M.P.] was having."

¶ 60          Regarding why G.P. was moved from her original placement, Pease testified as follows:

          "[G.P.] was [born] substance exposed and had some *** medical issues

- 13 -

early on. Obviously, those have continued. But during that time that she was with Christy, Christy was starting her own business, again, according to the records, and she was going through some things and was unable to meet [G.P.'s] needs."

¶ 61 Pease testified that G.P.'s placement was "medically specialized due to the ongoing Hepatitis C and the impacts it's having. And she also has a significant amount of food allergies that require special accommodations for her food." Kaylee took care of all G.P.'s medical needs and the special medical needs that the hepatitis C infection caused. Kaylee also understood the risks of being infected and was willing to provide for G.P. and accept those risks. She was also willing to adopt G.P.

¶ 62 Pease testified that M.P. lived alone with Jennifer, who was meeting all of M.P's needs, and she was happy. Jennifer wanted to adopt M.P., who referred to Jennifer as "mom, mommy, or mama." M.P. called respondent "daddy."

¶ 63 Pease also testified that the two foster mothers—Kaylee and Jennifer—lived in homes with adjoining yards and occasionally brought M.P. and G.P. together. Pease estimated M.P. and G.P. spend between 15 to 20 hours a month together. The foster parents also expressed a willingness to reestablish or maintain contact with the biological parents.

¶ 64 Pease stated that Erin's husband, Billy C., had filed a motion that was currently pending and contained allegations about the foster parents. She looked into those allegations, stating, "We had a DCFS clinical staffing. We also went through *** a DCFS hearing with the administrative law judge [(ALJ)] to address the concerns and have them be heard." Ultimately, the ALJ found that the allegations had no basis in fact, and Pease had no reservations about the foster care placements.

¶ 65 We note that the record includes the opinion of the ALJ pertaining to the

administrative appeal by Brenna, in which she alleged that the children's placements were not in their best interests. In that opinion, the ALJ reviewed evidence regarding the initial placement of M.P. and G.P. and the circumstances leading to their placement in different homes. The ALJ noted (1) how the children benefitted from individualized treatment in separate homes and (2) the testimony that the agency had considered moving M.P. and G.P. together but decided against it due to issues faced by the children, including behavioral issues for M.P. and medical issues for G.P. Accordingly, the ALJ recommended that DCFS deny the request to remove the children from their placements and place them with Erin and Billy C.

¶ 66        Pease opined it was in the children's best interests to terminate respondent's and Brenna's parental rights, explaining as follows:

> "If this was based on love alone, we wouldn't be here because they love their children and their children love them and they are bonded to one another.
>
> However, we are at *** roughly a thousand days that they've been in care and we had to take a step back and say *** they don't have a concept of time and they need to have permanency. And so it would be my recommendation *** that is the goal."

¶ 67        On cross-examination, Pease testified that although it was agency policy to keep siblings together, the children were placed in separate homes so they each could receive individualized care and to prevent G.P. from infecting M.P. with hepatitis C. Pease said they were thriving in their current placements.

¶ 68                                    b. Brenna

¶ 69        Brenna testified that the children were doing "relatively good" at their placements. However, the day before the hearing, she had just visited her children, and M.P.

- 15 -

asked if she could come home with Brenna "forever."

¶ 70        Brenna testified, "[M.P.] wants to be with mommy and daddy. She wants to be able to [be] with sissy. And she will hold her hand. She will say [G.P.], hold my hand and she won't let go of her." G.P., on the other hand, was "kind of more like I want my own thing." The children were "best friends when they can see each other." She was concerned that the children were separated and not adequately allowed to be with one another because she wanted them to have the opportunity to develop a sibling relationship.

¶ 71        During one visit with M.P., Brenna noticed bruising on the back of M.P.'s neck when M.P. said her back hurt. Brenna did not question how she got the bruising but suspected it was from the placement. She did not report the injury to DCFS because she feared it would be seen as retaliatory.

¶ 72                                c. Respondent

¶ 73        Respondent testified that it was in the best interests of the children not to terminate his and Brenna's parental rights. The foster parents did not have any familial ties to respondent and Brenna; they were simply friends. Respondent explained, "My kids have not seen aunts, uncles, grandparents, not a single family member besides their mother and father since this has started." He felt that it was important for the children to grow up living with one another. If not placed with respondent and Brenna, he stated the children would be best off with their aunt and uncle, Erin and Billy C., who once had custody of M.P.

¶ 74        Respondent testified that he was dedicated to maintaining his sobriety and support system. He was willing to continue random drug drops and outpatient treatment. He believed that if his rights were terminated, the children would never see him or Brenna again based on the foster parents' lack of effort to keep in touch with him and Brenna. In most of the photos he had

seen of M.P., she was alone and looked "depressed."

¶ 75　　　　On cross-examination, respondent testified that he had a good support system but chose not to reach out to them regarding his drug addiction. He stated, "In my addiction, I chose to do the wrong thing. I have no excuse. \*\*\* I'm a drug addict and I chose to do the wrong thing. I have no excuse for that. I'm not sitting up here trying to deny anything."

¶ 76　　　　Respondent testified that the foster parents did not communicate very much with him or Brenna. For example, he was unaware that G.P. had any allergies because he "never once had a problem with her eating, drinking any food." Because he was not told about these allergies, when he visited G.P., he did not know what not to feed her. His biggest concern was that the children were going to be separated from one another. He explained:

> "They're never going to know their biological family. They are going to grow up with complete strangers. And I think it's going to hurt them. My daughters have bonded with us. They have bonded with their cousins. They have bonded with their stepbrother and sister and they're just going to be cut off from all of that. And I don't think it's in the best interest of my children to be torn apart like that."

¶ 77　　　　Respondent testified that M.P. had recently told him during a visit "how she misses her best friend \*\*\* and she never gets to see her." He asked what she wanted for Christmas and she said, "[T]o come home to her family." Respondent acknowledged that the children came into care because of his and Brenna's actions but felt it was not in the girls' best interests to be separated from their family. He said that at just about every visit, M.P. would ask about respondent's family and if they could come home. G.P. and M.P. referred to respondent and Brenna as "daddy" and "mommy."

¶ 78　　　　　　　　　　　　　　　d. Rachel Wilson

¶ 79         Rachel Wilson testified that she worked for Primed For Life as an advocate for respondent and Brenna, but primarily Brenna. Wilson had been present on "three or four different occasions" for visits between respondent, Brenna, and the children. The children appeared to be familiar with one another and love one another and their parents. Wilson did not believe that the foster parents had not "attempted at all to maintain any sort of contact with their biological family."

¶ 80                                             e. Erin

¶ 81         Erin testified that she was Brenna's sister and M.P. had originally been placed with her in April 2022. When M.P. came into her care, she had two children, one of whom was three months old, and the other was three years old. Erin had M.P. in her care for a little over three months. She asked the caseworker at that time if he could "help us with placement" because "we were struggling with a new baby and finances and just *** the chaos of a new baby." She thought that her friend Jennifer could take over M.P.'s placement until she was financially prepared to take M.P. back. After that point, Jennifer lost touch with Erin. She would be willing to take G.P. and M.P. into her custody and maintain relationships with their biological family.

¶ 82         On cross-examination, Erin testified that G.P. and M.P. had not had visits with her children since December 2023 and the foster parents had stopped allowing extended family to visit the children. When asked what concerns she had for the best interests of G.P. and M.P. she answered as follows:

          "I mean, if I could tell of an experience that just that I had. In April or
          May of this past year when I went to pick my daughter up from daycare, [M.P.]
          was going to the same daycare at the time as my daughter. And I walked in [to]

pick her up and I saw [M.P.] sitting in the living room crying and I asked her ***
what was wrong, sweetie. And she said I just really miss my mom, and I just want
to give her a hug.

*** I said, well come and give auntie a hug. I'm the older sister like
you're [G.P.'s] older sister. And *** older sisters give the best hugs anyway. And
she really needed that. She said, I really miss mommy. And I said I know you
miss mommy a lot. I said, but we all love you and your mommy loves you.

*** I think that these girls need each other and I think that they need their
parents. And I think they need to be able to call mommy and daddy if they are
feeling sad. They need to be able to have that."

¶ 83    Erin testified that before Kaylee took in G.P., Kaylee had talked about moving to
New Orleans multiple times. Kaylee was almost never home on weekends. In Erin's opinion, it
would be in the best interests of the children not to have respondent's and Brenna's parental
rights terminated because the children needed to grow up together and know their biological
family.

¶ 84                    f. The Trial Court's Decision

¶ 85    The trial court began its oral ruling by listing the statutory best interests factors it
was required to consider. The court noted that the children had been in care for two years and
eight months. M.P. had been in her current placement for two years and five months, while G.P.
had been in her current placement for two years and seven months. The parents were still on
methadone and had not been able to wean down the dosage. Since the start of the case, they had
made no progress toward sobriety. The court acknowledged that whether it terminated the
parents' parental rights, the children would nevertheless have to experience the trauma of either

losing their parents or being left in foster care. Regarding the parents' concern that G.P. may eventually be moved out of Illinois, the court noted that it had to decide on what it knew and not speculation of what could happen after parental rights were terminated. The court stated the following:

> "If I look to whether or not the parents can be stable, that's only a hope. What I know is that they've not been able to do that. What I know is that the children are in a stable environment. What I know is that their needs are being met. What I know is that they—according to the caseworker, are thriving in their homes. What I know is that there is somebody for each of these children who is willing to adopt them."

¶ 86        The trial court acknowledged that M.P. had said she "wants to be with mommy and daddy" but questioned whether M.P. comprehended that meant "leaving her current foster home." The court found the State had met its burden of showing that it was in the minors' best interests that the parental rights of both parents be terminated.

¶ 87        This appeal followed.

¶ 88                                II. ANALYSIS

¶ 89        Respondent appeals, arguing that the trial court's (1) fitness and (2) best interest findings were against the manifest weight of the evidence. We disagree and affirm.

¶ 90        A. Evidence Presented at Permanency Review Hearings Is Not Relevant to the
                    Fitness Portion of Termination Proceedings

¶ 91        As an initial matter, we note that the background section of respondent's appellate brief discusses, in large part, evidence and information pertaining to the permanency review hearings in the underlying cases, intermixed with evidence presented at the fitness portion of the

termination proceedings. We have previously written—and now repeat—that the evidence presented at permanency review hearings, generally, is of no importance to the fitness portion of termination proceedings. Regarding that point, we wrote the following in *In re Dar. H.*, 2023 IL App (4th) 230509, ¶¶ 45-49:

> "Because evidence presented at hearings other than a fitness hearing, like permanency review hearings, is generally not subject to the rules of evidence, a discussion in an appellant's brief of the evidence presented at a permanency review hearing, as well as any remarks of the trial court regarding that evidence, is a waste of both counsel's and this court's time.
>
> We reiterate that a trial court's fitness findings made after it conducted a hearing on a petition to terminate parental rights are to be based solely on the evidence the court heard at the fitness hearing, *not* on any evidence that may have been presented at other hearings that preceded the fitness hearing.
>
> * * *
>
> Because of the different evidentiary rules governing fitness hearings and permanency hearings, evidence and orders from permanency hearings may not be considered by a trial court at the fitness portion of the termination proceedings. [Citation.] Similarly, this court will not reverse a trial court's fitness findings based on evidence presented at the permanency hearings; instead, we review the trial court's findings based solely on evidence presented at the fitness hearing." (Emphasis in original.).

¶ 92    Accordingly, we urge the appellants in parental termination cases to avoid discussing permanency hearings and reports. Instead, the briefs of all counsel should focus on the

evidence that was actually presented during the fitness portion of the termination proceedings.

¶ 93                              B. The Trial Court's Fitness Findings

¶ 94          It is well settled that "[b]ecause each of the statutory grounds of unfitness is independent, the trial court's finding may be affirmed where the evidence supports a finding of unfitness as to any one of the alleged grounds." *In re Adoption of P.J.H.*, 2019 IL App (5th) 190089, ¶ 11. Based on our review of the record, we conclude that the court's findings that respondent failed to make reasonable progress within the applicable nine-month periods were not against the manifest weight of the evidence. Accordingly, we discuss only those findings.

¶ 95                              1. *The Applicable Law and Standard of Review*

¶ 96          The State must prove unfitness as defined in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2022)) by clear and convincing evidence. *In re N.G.*, 2018 IL 121939, ¶ 28. Section 1(D)(m)(ii) of the Adoption Act defines an unfit person as a parent who fails to make "reasonable progress toward the return of the child" during any nine-month period following an adjudication of neglect or abuse. 750 ILCS 50/1(D)(m)(ii) (West 2022).

> "Reasonable progress is an objective review of the steps the parent has taken toward the goal of reunification and examines the demonstrability and quality of those steps. [Citation.] Reasonable progress exists when the trial court can conclude that, in the near future, it will be able to order the children returned to parental custody." *Dar. H.*, 2023 IL App (4th) 230509, ¶ 53.

¶ 97          The determination of parental unfitness requires factual findings and credibility assessments that the trial court is in the best position to make. *In re M.I.*, 2016 IL 120232, ¶ 21. Accordingly, we will not reverse a trial court's finding of parental unfitness unless it is against the manifest weight of the evidence. *N.G.*, 2018 IL 121939, ¶ 29. A decision is against the

manifest weight of the evidence when the opposite conclusion is clearly apparent. *Id.*

¶ 98                                    2. *This Case*

¶ 99          Here, the primary reason the children were taken into care was respondent's and Brenna's drug use. Indeed, G.P. was born with drug exposure, and, despite DCFS's leaving the case as an intact case, shortly thereafter, Brenna tested positive again and the children were taken into protective custody. So, the most important question for the trial court was whether respondent's progress was of such a quality that the court, in the near future, would be able to return the children to his care. The court found that it was not, and we agree.

¶ 100          During all three time periods—(1) July 2022 to April 2023, (2) April 2023 to January 2024, and (3) November 2023 to August 2024—Brenna and respondent relapsed. During the July 2022 to April 2023 period, Brenna tested positive for illegal substances. In August 2023, Brenna tested positive for opiates. In September 2023, respondent tested positive for morphine, codeine, and heroin. In January 2024, Brenna tested positive for fentanyl. In February 2024, Brenna tested positive for fentanyl, and respondent tested positive for fentanyl, heroin, codeine, and morphine. Further, respondent admitted that in March 2024, he had taken heroin.

¶ 101          Throughout the entirety of this case, respondent and Brenna continued to use illegal drugs, and neither parent completed inpatient treatment for their addictions, despite Pease's urging them to pursue that treatment. In addition, after February 2024, Pease lost nearly all contact with the parents, they stopped participating in drug screens, and visitations dropped to once a month.

¶ 102          The record shows that at the time of the termination proceedings, as the trial court observed, respondent was in the same position he was in nearly 1000 days earlier, when the children were taken into care. Specifically, respondent was still (1) taking outpatient methadone,

with no reduction in its use, (2) periodically relapsing back into opioid use, and (3) living in a household with another opioid user. Based on these facts, the trial court found that respondent had not made reasonable progress toward the minors' return. Nothing about that decision was against the manifest weight of the evidence.

¶ 103                    C. The Trial Court's Best-Interests Findings

¶ 104          Respondent also argues that trial court's findings that termination of his parental rights was in the children's best interests was against the manifest weight of the evidence. We disagree.

¶ 105                    1. *The Applicable Law and Standard of Review*

¶ 106          After a finding of unfitness, the State must prove by a preponderance of the evidence that it is in the child's best interests to terminate parental rights. *In re D.T.*, 212 Ill. 2d 347, 363-66 (2004); 705 ILCS 405/2-29(2) (West 2022). "[A]t a best-interests hearing, the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *D.T.*, 212 Ill. 2d at 364.

¶ 107          When determining the best interest of a child, a trial court must consider the factors set forth in section 1-3(4.05) of the Juvenile Court Act of 1987 (705 ILCS 405/1-3(4.05) (West 2022)). See *In re T.A.*, 359 Ill. App. 3d 953, 959-60 (2005). Those factors include: (1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's familial, cultural, and religious background and ties; (4) the child's sense of attachments, including where the child feels loved, attached, and valued; (5) the child's sense of security, familiarity, and continuity of affection; (6) the child's wishes and long-term goals; (7) the child's community ties; (8) the child's need for permanence; and (9) the uniqueness of every family and each child. 705 ILCS 405/1-3(4.05) (West 2022).

¶ 108                                    2. *This Case*

¶ 109          Respondent's argument that the trial court's best-interests findings were against the manifest weight of the evidence is based primarily on his belief that, after termination, G.P. and M.P. will be separated from one another and deprived of relationships with their biological family—in essence, the factors of (1) the development of the child's identity and (2) the child's familial, cultural, and religious background and ties. In particular, respondent focuses on his and Brenna's speculation that Kaylee might move out of Illinois with G.P. following termination proceedings. He also contends that termination would not be in the children's best interests because the children recognize him as "daddy," they have strong bonds and attachments to him, and with more time, he could show that he can maintain his sobriety and obtain treatment.

¶ 110          We first note that "it is not this court's role to reweigh evidence and reach the result we think would be appropriate; it is our role to determine if the result the lower court reached was reasonably supported by the record." *In re L.G.*, 2025 IL App (1st) 241464, ¶ 42. We conclude that the court's decision here is well supported by the record.

¶ 111          The trial court found that the children, who were both under five years old, had been in care for "976 days" at the time of the best-interests portion of the termination hearing. At that point, respondent was still taking methadone, without any reduction in its use, and had been unable to maintain sobriety for any significant length of time.

¶ 112          The trial court noted that regardless of whether respondent's parental rights were terminated or not, the children were going to experience some trauma. The court placed weight on the facts that they (1) had spent most of their lives in their foster placements, (2) were in stable, loving households, (3) had their needs met, and (4) were ultimately "thriving in their homes." In addition, the children had been able to spend time with one another in their

placements, and both placements were willing to provide permanency through adoption.

¶ 113    Respondent's speculation as to the possibility that termination might sever the ties between the children does not provide a basis to overturn the trial court's careful consideration of this issue. This is especially true in this case because the foster parents had committed to continuing ties between the children. See *In re Ca. B.*, 2019 IL App (1st) 181024, ¶ 36 (stating any concern about a continued relationship with siblings was ameliorated by the foster family's commitment to continue familial ties).

¶ 114    Although respondent understandably wants to guarantee that he and his family remain in the children's lives into perpetuity, the focus at the best-interests portion of termination proceedings is on the children's best interests. See *D.T.*, 212 Ill. 2d at 364 ("[A]t a best-interests hearing, the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life."). It was *respondent's* failure to make any reasonable progress toward sobriety and a household free of illegal drug use that created this unfortunate situation.

¶ 115    Essentially, respondent insists that the children be left in foster care limbo in the hope that, at some point in the future, the children will be returned to his care. However, his insistence that the children be deprived of any real permanence in their lives until, if ever, the children could be returned to his care was reasonably rejected by the trial court. See *In re R.L.*, 2021 IL App (1st) 210419, ¶ 15 ("[I]t is not in a child's best interest for the child's status to remain in limbo for extended periods of time."); see also *In re J.B.*, 2019 IL App (4th) 190537, ¶ 35 ("To permit respondent's parental rights to continue in the hope that he will decide to begin engaging in services at some later date *** would be tantamount to depriving the children of [their] need for permanence." (Internal quotation marks omitted.)).

¶ 116   We conclude that the trial court's decision was not close to being against the manifest weight of the evidence.

¶ 117                                    III. CONCLUSION

¶ 118   For the reasons stated, we affirm the trial court's judgment.

¶ 119   Affirmed.