2024 IL App (4th) 240534-U

NOS. 4-24-0534, 4-24-0535 cons.

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

FILED
August 2, 2024
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* K.S. and T.S., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Tazewell County |
| Petitioner-Appellee, | ) | Nos. 22JA151 |
| v. | ) | 22JA152 |
| Ayana S., | ) | |
| Respondent-Appellant). | ) | Honorable |
| | ) | Timothy J. Cusack, |
| | ) | Judge Presiding. |

PRESIDING JUSTICE CAVANAGH delivered the judgment of the court.
Justices Steigmann and DeArmond concurred in the judgment.

**ORDER**

¶ 1    *Held*: The appellate court affirmed, concluding the trial court's findings that respondent
was unfit and termination of her parental rights was in the minors' best interest
were not against the manifest weight of the evidence.

¶ 2    On March 25, 2024, the trial court entered an order terminating the parental rights
of respondent, Ayana S., to her minor children, K.S. (born in March 2018) and T.S. (born in
November 2020). Respondent appeals the order. For the reasons that follow, we affirm.

¶ 3                    I. BACKGROUND

¶ 4                    A. Case Opening

¶ 5    On July 21, 2022, the State filed petitions for adjudication of wardship, alleging
the minors were neglected due to being in environments injurious to their welfare in that
(1) respondent and her grandmother, Merilee S., were indicated by the Illinois Department of

Children and Family Services (DCFS) for environmental neglect due to the deplorable conditions of the home; (2) the minors were dirty when respondent brought them outside and told the DCFS investigator that she and the minors were living in the back of a tobacco shop; (3) respondent was not cooperating with intact services; (4) on three occasions in 2021, K.S. got out of the home and wandered in the street, resulting in the police being called and bringing him home; and (5) respondent's paramour at the time had a criminal history, including convictions for aggravated domestic battery and aggravated battery to a person over 60 years of age. The same day, the trial court ordered temporary guardianship and custody of the minors placed with DCFS.

¶ 6         On October 4, 2022, the trial court adjudicated the minors neglected pursuant to section 2-3(1)(b) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1)(b) (West 2022)). Following the dispositional hearing held the same day, the court found respondent unfit for reasons other than financial circumstances alone to care for the minors, made the minors wards of the court, and continued their guardianship and custody with DCFS, with the right to place.

¶ 7         On August 21, 2023, the State filed petitions to terminate respondent's parental rights to both minors. The State alleged respondent was an unfit parent in that she failed to make reasonable progress toward the return of the minors during a nine-month period following the adjudication of neglect, namely between November 15, 2022, and August 15, 2023 (750 ILCS 50/1(D)(m)(ii) (West 2022)).

¶ 8                          B. Fitness Hearing

¶ 9         The trial court held the fitness hearing on February 27, 2024, and March 21, 2024.

¶ 10                       1. *The State's Evidence*

¶ 11                       a. Dena Krigbaum

¶ 12        Dena Krigbaum was the foster care supervisor from Children's Home assigned to the case from its inception until on or about January 11, 2023. Respondent was required to complete a parenting class and a substance abuse assessment, submit to random drug drops three times a month, and engage in counseling. Krigbaum recalled "that there were periods of time where [respondent] stated she wasn't ready or willing to participate in services, so there was some delay in getting things like counseling up and running." However, respondent later expressed "feel[ing] like she could benefit from the services and *** want[ing] us to make sure that we got her in as soon as we could." Respondent eventually began attending counseling. According to Krigbaum's review of the visitation notes, respondent's visits with the minors "looked [like] they were going well." Respondent attended the scheduled visits and "was attentive to [the minors'] needs." All of respondent's drug drops during the time Krigbaum supervised the case were negative.

¶ 13                              b. Larry Little

¶ 14        Larry Little was the assigned caseworker from Children's Home from January 2023 to February 2023. During this time, respondent never told Little about having a new boyfriend, Tanner J. Respondent was either homeless or living with her grandmother. When respondent was looking for a new apartment, Little told her she needed at least two bedrooms. Neither a studio nor a one-bedroom apartment would be acceptable given K.S.'s sexually inappropriate behaviors at daycare and the need to keep him and T.S. from sharing a bedroom. Little acknowledged respondent was "always cooperative" with him. Respondent was working full-time as a server and bartender at a restaurant and was about to complete the parenting class in the beginning of March. Little felt the visits he observed between respondent and the minors were "very appropriate." Respondent appropriately addressed K.S.'s behavioral issues.

Respondent also brought "nutritious food" to the visits and engaged in "[l]oving interaction" with the minors.

¶ 15                                             c. Emmett Lange

¶ 16            Emmett Lange was the caseworker between March 2023 and August 15, 2023. Respondent completed the substance abuse assessment shortly before Lange was assigned to the case. By the time Lange was assigned the case, respondent had completed the parenting class and was engaged in counseling. Shortly thereafter, respondent obtained a studio apartment, despite being told by Little it would not be acceptable housing. According to her counselor, respondent was making progress in counseling. Respondent was employed at Par-A-Dice Casino and Hotel as a security officer.

¶ 17            On March 24, 2023, respondent asked Lange if Tanner could accompany her to visits with the minors. After Lange advised she needed to complete a background check on Tanner, respondent told Lange "he shouldn't have anything on his background and that he should be clear." Respondent did not tell Lange about a domestic violence incident with Tanner requiring police involvement on March 21, 2023—three days before making this request. After receiving the results of the background check, Lange noticed "there were quite a few concerning things on it" and accordingly told respondent she "would not be able to allow contact between [Tanner] and the [minors] due to him being a risk." However, Lange learned in April 2023 that respondent brought Tanner to extra visits the foster parent allowed on weekends. After Lange learned this, she called respondent and reminded her Tanner was not allowed at the visits. Respondent said she thought Tanner was only prohibited from visits at Children's Home. Consequently, the extra visits were stopped. Nevertheless, Lange observed several visits from March 2023 to June 2023. Lange noticed respondent was able to use the skills she learned in her

- 4 -

parenting class and was "very, very open and honest with [the minors] and *** had positive interactions with them for the most part during the visits."

¶ 18    Despite Lange's concern over Tanner's criminal history and her instruction that he not be present at visits, respondent "did continue to ask about [Tanner] coming to visits after that." In particular, respondent asked about this again at a child and family team meeting in June 2023. When confronted during this meeting with the police report of the March 21, 2023, domestic violence incident with Tanner, respondent "minimized what happened and told [Lange] that the charges were dropped and that it shouldn't be a concern." Lange spoke with respondent in August 2023 about police reports of incidents involving Tanner's drug use. These reports were from a May 7, 2023, incident in which Tanner overdosed in the bathroom of a Casey's General Store, and a June 30, 2023, incident in which drugs (belonging to Tanner) were found in respondent's car. The latter police report also indicated respondent was 15 weeks pregnant. Respondent stated Tanner "was no longer using drugs as of August, the beginning of August, and that he was clean and sober." Respondent's failure to disclose these incidents made Lange feel concerned about her progress. Additionally, respondent's counselor was not aware of these incidents until Lange discussed the police reports with the counselor.

¶ 19    Respondent was engaging in random drug drops "[f]airly consistently" and informed Lange if she was not able to provide a drug drop on a particular day due to work or illness. In June 2023, respondent only did one drug drop, and it was positive for amphetamines and methamphetamines. Respondent explained she was hospitalized and prescribed several medications which, according to the doctors, could yield false positives on a drug test. Respondent sent Lange a picture of a bottle which, although it had her name on it, had most of the name of the medication "scratched off." Lange discussed this with the agency's drug and

alcohol specialist and learned the medication respondent said she was taking can yield false positives. However, this medication did not appear on respondent's medical chart, and none of the ones that did could yield false positives. Respondent's drug drop results were admitted into evidence.

¶ 20                              2. *Respondent's Evidence*

¶ 21                                 a. Taylor Champagne

¶ 22        Taylor Champagne had been respondent's counselor since January 2023. Respondent's treatment goals were to process trauma, develop coping skills, and manage depression. When asked to describe the changes she had seen in respondent, Champagne answered:

> "I would say that she is more open with me, perhaps a little more comfortable in session. She was always very honest from the beginning about not necessarily being fond of the idea of therapy or counseling just based on some past experiences, so I think she's gotten more used to that setting and me specifically."

¶ 23        Respondent did not tell Champagne about the March 21, 2023, domestic violence incident with Tanner. Respondent contacted Champagne on May 10, 2023, requesting to cancel the scheduled session. Respondent did not say why or tell Champagne about Tanner's overdose three days before. Champagne and respondent had a session scheduled for June 30, 2023, but respondent neither attended nor responded to Champagne's efforts to confirm the session. Respondent did not tell Champagne about being pulled over and drugs being found in her car that day.

¶ 24                                  b. Respondent

¶ 25            Respondent testified she met Tanner in September 2022 and they started dating shortly thereafter. Respondent and Tanner were a couple until the beginning of July 2023. That month, the caseworker told respondent she had to choose between Tanner and the minors, so respondent and Tanner "broke up and became like friends."

¶ 26            Respondent first learned Tanner was using narcotics on March 21, 2023. On that day, respondent saw Tanner using narcotics in the kitchen. When respondent tried to take them away from Tanner, they "got into a yelling match" and he "bear-hugged [her] and so the cops came." After this incident, respondent told Tanner he could not be on drugs if they were going to be a couple. Tanner "said that he was going to get clean and stay clean and got into treatment." Tanner began attending treatment at Heartland Services.

¶ 27            On May 7, 2023, respondent and Tanner went to Casey's General Store to buy snacks. Respondent sat in the car while Tanner went inside. Eventually, respondent "had a really bad gut-wrenching feeling that something wasn't okay for how long [Tanner] had been in there." Respondent called Tanner a few times, but he didn't answer. Respondent went inside the store and up to the bathroom, and she "heard like as if someone was choking, like a gasping sound." Respondent retrieved Narcan from the car and had the store clerk open the bathroom for her. Respondent gave Tanner Narcan and began performing CPR. Respondent found a needle and spoon and threw them in the toilet as an "instant reaction" from doing this with her mother. After this incident, respondent again confronted Tanner about his drug use.

¶ 28            On Mother's Day, four days after the overdose incident, respondent took Tanner for a visit with the minors. When asked why she thought this was appropriate, respondent answered, "I learned that sometimes addicts if they get involved with something that's meaningful or joyful or like helping other people, anything like that, that hands-on with other

people it can help them. For me it did." Respondent did not "end" their relationship, but she "didn't want to not still have him in my life at that point." Respondent still would have Tanner occasionally stay at her home with her. Respondent testified, "Like, sometimes [Tanner] stayed for a week. Sometimes he wouldn't."

¶ 29 On June 30, 2023, respondent was pulled over. The police asked respondent if she had any drugs, and she said no. Tanner said he did not have any drugs, either. Respondent consented to a search of her vehicle. The police found Tanner's Suboxone "and a baggie that had something in it." The police towed respondent's car "because [Tanner] did have whatever was in the bag." Respondent did not tell her caseworker why her car was towed because nobody asked her why. Respondent was not going to provide information about police contacts unless the caseworker asked specific questions because respondent "had enough going on." When asked if she and Tanner were "dating" at that time, respondent answered, "[T]here again, I didn't really put too much of a label on it, but we were not dating other people, kind of, yeah."

¶ 30 Around that time, respondent learned she was pregnant. While respondent informed Champagne about this "right after" the June 30, 2023, incident, she wanted to wait until after court in August to tell her caseworker. When asked why, respondent answered, "Because I was scared and nervous and I didn't know what would happen like, if I would get in trouble for being pregnant or, you know. It was all kind of new to me." Respondent continued, "that would give me enough time since I just found out myself about it and I had *** things going on mentally."

¶ 31 Respondent signed a lease for a studio apartment in March 2023. Respondent explained, "It's very expensive to live anywhere so to find something that was affordable and

also close by was what I got." Respondent viewed a two-bedroom apartment but "discovered that there were creepy crawlers that [she] didn't want to live with."

¶ 32                                    3. *The Trial Court's Unfitness Finding*

¶ 33            The trial court observed respondent did not make progress "at all in any fashion." This was in large part because respondent maintained a relationship with Tanner, despite knowing it was harmful to her and the minors. The court also expressed disappointment with respondent's lack of transparency and truthfulness with her caseworker about the domestic violence incident with Tanner. Ultimately, the court found the State met its burden of proving respondent's unfitness by clear and convincing evidence.

¶ 34                                    C. Best-Interest Hearing

¶ 35            The trial court then held the best-interest hearing. Lange testified the minors were in separate foster homes. Lange found T.S.'s foster home, which she visited at least once a month, was clean and appropriate. Lange had witnessed the bond between T.S. and her foster family. The family was meeting T.S.'s needs and T.S. seemed "very comfortable" in the home. The foster parents expressed their willingness to adopt T.S. The foster mother testified, corroborating Lange's testimony and personally expressing her willingness to adopt T.S.

¶ 36            Lange testified K.S. had not had an easy time in foster care. K.S. was diagnosed with attention-deficit/hyperactivity disorder (ADHD) and had a "developmental delay." K.S. was in counseling and a special education program at school. Lange testified K.S.'s foster home was clean and appropriate. The foster parents were hesitant to adopt K.S., but Lange was referring K.S. for intensive placement stabilization services to work with the family to get K.S. stabilized in the home. K.S. was bonded to his foster parents and was having his educational, medical, and

psychiatric needs met. K.S.'s foster mother was a "strong advocate" for him with regard to his ADHD and developmental delay.

¶ 37 Respondent testified that, at her most recent visit with the minors, she found K.S. to have "a lot of mixed emotions." Respondent said K.S. was confused about how to "take his anger out on someone or something." Respondent tried to redirect K.S.'s anger into breathing exercises and explained to him "it's okay not to be okay." Respondent expressed her love for the minors and her desire for them to live with her and Tanner.

¶ 38 After hearing evidence and argument from the parties and considering the statutory best-interest factors, the trial court concluded it was in the minors' best interest to terminate respondent's parental rights.

¶ 39 This appeal followed.

¶ 40 II. ANALYSIS

¶ 41 On appeal, respondent argues the trial court erred "in finding that the State had proven its petition to terminate [respondent]'s parental rights by clear and convincing evidence," the standard applicable only at the fitness stage. Although respondent does not explicitly challenge the court's best-interest finding, she argues the dispositional order terminating her parental rights should be vacated. We will address respondent's arguments in turn.

¶ 42 A. Evidence Presented at Permanency Review Hearings

¶ 43 We first address an issue in respondent's brief similar to what we encountered in *In re Dar. H.*, 2023 IL App (4th) 230509. Like the respondent in that case, respondent here relies on the order from a permanency review hearing finding she made both reasonable efforts and reasonable progress to support the proposition the trial court's unfitness finding was against the manifest weight of the evidence. We reiterate what we explained in *Dar. H.*:

"Because evidence presented at hearings other than a fitness hearing, like permanency review hearings, is generally not subject to the rules of evidence, a discussion in an appellant's brief of the evidence presented at a permanency review hearing, as well as any remarks of the trial court regarding that evidence, is a waste of both counsel's and this court's time.

\* \* \*

Because of the different evidentiary rules governing fitness hearings and permanency hearings, evidence and orders from permanency hearings may not be considered by a trial court at the fitness portion of the termination proceedings. [Citation.] Similarly, this court will not reverse a trial court's fitness findings based on evidence presented at the permanency hearings; instead, we review the trial court's findings based solely on evidence presented at the fitness hearing." *Dar. H.*, 2023 IL App (4th) 230509, ¶¶ 45, 49.

¶ 44                    B. The Trial Court's Unfitness Finding

¶ 45        Parental rights may not be terminated without the parent's consent unless the trial court first determines, by clear and convincing evidence, the parent is unfit as defined in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2022)). *In re Gwynne P.*, 215 Ill. 2d 340, 354 (2005). Pursuant to section 1(D)(m)(ii) of the Adoption Act (750 ILCS 50/1(D)(m)(ii) (West 2022)), a parent may be found unfit if she fails "to make reasonable progress toward the return of the child \*\*\* during any 9-month period following the adjudication of neglected or abused minor."

¶ 46	"Reasonable progress" has been defined as "demonstrable movement toward the goal of reunification." (Internal quotation marks omitted.) *In re C.N.*, 196 Ill. 2d 181, 211 (2001). This is an objective standard. *In re F.P.*, 2014 IL App (4th) 140360, ¶ 88. The benchmark for measuring a parent's progress toward reunification

> "encompasses the parent's compliance with the service plans and the court's directives, in light of the condition which gave rise to the removal of the child, and in light of other conditions which later become known and which would prevent the court from returning custody of the child to the parent."
> *C.N.*, 196 Ill. 2d at 216-17.

Reasonable progress exists when the trial court can conclude it will be able to order the child returned to parental custody in the near future. *In re L.L.S.*, 218 Ill. App. 3d 444, 461 (1991).

¶ 47	We will not disturb a finding of unfitness unless it is against the manifest weight of the evidence. *In re J.H.*, 2020 IL App (4th) 200150, ¶ 68. "A finding is against the manifest weight of the evidence only if the evidence clearly calls for the opposite finding [citation], such that no reasonable person could arrive at the circuit court's finding on the basis of the evidence in the record [citation]." (Internal quotation marks omitted.) *J.H.*, 2020 IL App (4th) 200150, ¶ 68. "This court pays great deference to a trial court's fitness finding because of [that court's] superior opportunity to observe the witnesses and evaluate their credibility." (Internal quotation marks omitted.) *In re O.B.*, 2022 IL App (4th) 220419, ¶ 29.

¶ 48	Here, respondent was required to complete a parenting class and a substance abuse assessment, submit to random drug drops three times a month, engage in counseling, and obtain suitable housing. During the relevant period, respondent completed the parenting class and the substance abuse assessment. While respondent did 17 drug drops, there were only two

months (December 2022 and May 2023) when she did the required 3 drops per month. Indeed, respondent only did one drop in March 2023 and April 2023. While the other drops were negative, respondent tested positive for amphetamines and methamphetamines on June 7, 2023. Although respondent told Lange those positive tests were because of a medication that could yield false positives, she was not able to provide proof she was prescribed such medication. Moreover, such medication was not reflected in the medical records from respondent's recent hospitalization.

¶ 49　　　　Despite attending counseling and completing a parenting class, respondent continued her relationship with Tanner through, and after, (1) the March 2023 domestic violence incident in which he "bear-hugged" her after being confronted about drug use, (2) the May 2023 incident in which he overdosed on drugs in the bathroom of a convenience store, and (3) the June 2023 incident in which respondent's car was towed due to police discovering drugs in Tanner's possession. Respondent did not disclose those incidents to Lange until being confronted with police reports, and respondent's counselor was not aware of them until Lange brought the reports to her attention. Respondent also minimized the domestic violence incident by telling Lange "the charges were dropped and that it shouldn't be a concern." Further, respondent decided not to disclose her pregnancy to Lange until August 2023 due to what she characterized as a fear of "get[ting] in trouble for being pregnant" and "things going on mentally." Respondent had Tanner accompany her to visits, including one four days after his overdose, despite being told he was not allowed at visits due to his criminal history. Respondent explained she took Tanner to visits to afford him a "hands-on" opportunity to do something "meaningful" and "joyful." Also, respondent secured a studio apartment, despite Little advising she needed housing with at least two bedrooms due to concerns over K.S.'s sexually inappropriate behaviors at daycare.

Respondent did not apply for the two-bedroom apartment she visited because she "discovered that there were creepy crawlers that [she] didn't want to live with."

¶ 50　　　　Given this evidence, the trial court could have reasonably concluded respondent's progress was not sufficiently demonstrable or of such a quality that the court would be able to return the minors to her custody in the near future. See *L.L.S.*, 218 Ill. App. 3d at 461. Accordingly, we conclude the court's finding respondent had not made reasonable progress within the meaning of section 1(D)(m)(ii) of the Adoption Act (750 ILCS 50/1(D)(m)(ii) (West 2022)) was not against the manifest weight of the evidence.

¶ 51　　　　　　　　　　C. The Trial Court's Best-Interest Finding

¶ 52　　　　After a trial court finds a parent unfit, "the court then determines whether it is in the best interests of the minor that parental rights be terminated." *In re D.T.*, 212 Ill. 2d 347, 352 (2004). "[A]t a best-interests hearing, the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *D.T.*, 212 Ill. 2d at 364. The State must prove by a preponderance of the evidence termination of parental rights is in the minor's best interest. *D.T.*, 212 Ill. 2d at 366. In making the best-interest determination, the court must consider the factors set forth in section 1-3(4.05) of the Juvenile Court Act (705 ILCS 405/1-3(4.05) (West 2022)).

¶ 53　　　　On review, "[w]e will not disturb a court's finding that termination is in the [child's] best interest unless it was against the manifest weight of the evidence." *In re T.A.*, 359 Ill. App. 3d 953, 961 (2005). "A finding is against the manifest weight of the evidence only if the evidence clearly calls for the opposite finding [citation], such that no reasonable person could arrive at the [trial] court's finding on the basis of the evidence in the record [citation]." (Internal quotation marks omitted.) *J.H.*, 2020 IL App (4th) 200150, ¶ 68, 162 N.E.3d 454.

¶ 54        As mentioned above, respondent makes no real challenge to the trial court's best-interest determination. Respondent claims only that the court's "dispositional orders terminating [her] parental rights" should be vacated. Nevertheless, our review of the record indicates the evidence demonstrated both minors had a strong bond with their respective foster parents. The foster parents provided for the minors' needs, including food, clothing, shelter, and medical care. Both minors were doing well in their homes. The court considered the evidence in relation to the statutory best-interest factors and found it weighed in favor of terminating respondent's parental rights. We cannot conclude the evidence in the record "clearly calls for the opposite finding" or is such that "no reasonable person" could find as the court found. (Internal quotation marks omitted.) *J.H.*, 2020 IL App (4th) 200150, ¶ 68. Accordingly, the court's best-interest determination was not against the manifest weight of the evidence.

¶ 55                                III. CONCLUSION

¶ 56        For the reasons stated, we affirm the trial court's judgment.

¶ 57        Affirmed.