NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2026 IL App (4th) 250980-U

NOS. 4-25-0980, 4-25-0981, 4-25-0982 cons.

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
February 6, 2026
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* L.C., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Adams County |
|     Petitioner-Appellee, | ) | No. 21JA34 |
|     v.    (No. 4-25-0980) | ) | |
| Kristina C., | ) | |
|     Respondent-Appellant). | ) | |
| | ) | |
| | ) | No. 21JA35 |
| *In re* N.C., a Minor | ) | |
| | ) | |
| (The People of the State of Illinois, | ) | |
|     Petitioner-Appellee, | ) | |
|     v.    (No. 4-25-0981) | ) | |
| Kristina C., | ) | |
|     Respondent-Appellant). | ) | |
| | ) | |
| | ) | No. 21JA36 |
| *In re* A.C., a Minor | ) | |
| | ) | |
| (The People of the State of Illinois, | ) | |
|     Petitioner-Appellee, | ) | |
|     v.    (No. 4-25-0982) | ) | Honorable |
| Kristina C, | ) | John C. Wooleyhan, |
|     Respondent-Appellant). | ) | Judge Presiding. |

PRESIDING JUSTICE STEIGMANN delivered the judgment of the court.
Justices Zenoff and DeArmond concurred in the judgment.

**ORDER**

¶ 1   *Held:*   The appellate court affirmed the trial court's termination of respondent's parental rights.

¶ 2   Respondent, Kristina C., is the mother of L.C. (born August 2013), N.C. (born

May 2015), and A.C. (born June 2018). (Michael C. is the father of L.C., N.C., and A.C. and takes no part in the appeal.) In August 2025, in proceedings involving all three children, the trial court found respondent was an unfit parent and termination of respondent's parental rights would be in the minor children's best interests.

¶ 3    Respondent appeals, arguing that (1) the trial court's fitness findings were against the manifest weight of the evidence and (2) trial counsel provided ineffective assistance during the best-interest portion of termination proceedings. We disagree and affirm.

¶ 4                                 I. BACKGROUND

¶ 5                    A. Procedural History Regarding L.C., N.C., and A.C.

¶ 6    In June 2021, the State filed petitions for adjudication of wardship regarding L.C., N.C., and A.C. The petitions contained the following allegations of neglect:

          "a. There are five (5) minor children in this family: [K.C.] (age 16), [P.C.] (age 15), [L.C.] (age 7), [N.C.] (age 6), and [A.C.] (age 2).

          b. The family was recently reported to the [Illinois Department of Children and Family Services (DCFS)] hotline on two (2) separate occasions under 2406565D and 2406565J. Both reports centered around ongoing domestic violence [and] Father using methamphetamine. Father [was] arrested for Domestic Battery under 20 CM 189. Law enforcement was called to the family home on two (2) occasions in July 2020. Father was also arrested and charged for the incident on July 6, 2020[,] under cause number 20 CM 189.

          c. The family agreed to services, and an intact case opened on April 8, 2021. They were initially residing in various hotels but had periods of homelessness. The parents were staying with a friend, and the minors were

staying with extended family.

       d. On May 12, 2021, Mother admitted to consuming alcohol daily. On May 24, 2021[,] she reported her consumption to be three (3) pints of liquor every day. Mother also tested positive per an oral swab for methamphetamines on both May 24 and May 26, 2021. She has not initiated services for mental health or domestic violence counseling as referred by DCFS. On May 24, 2021, Mother presented with a large bruise on her cheek stating that Father had struck her. She later denied the incident.

       e. Father has tested positive for methamphetamines through the Probation Office on April 29, 2021[,] and May 17, 2021, and he tested positive through DCFS on April 30, 2021. Father began outpatient substance treatment. He attended one appointment but cancelled his subsequent appointment. He completed his assessment for the Men's Group but has not started the groups at this time."

¶ 7      On the same day the petitions were filed, the trial court conducted a shelter care hearing and placed temporary custody and guardianship of L.C., N.C., and A.C. with the guardianship administrator of DCFS.

¶ 8      In October 2021, the trial court conducted an adjudicatory hearing regarding all three children. Respondent admitted the allegations in the petitions, and the court found that the children were neglected minors as alleged in the petitions.

¶ 9      In December 2021, the trial court conducted a dispositional hearing regarding all three children, at the conclusion of which it entered a written order finding respondent unable and unwilling, for reasons other than financial circumstances alone, to care for, protect, train,

educate, supervise, or discipline the minors due to "issues of substance abuse, domestic violence, mental health, and having instability as stated in petition." The court found it was in the best interests of the minors and the public for the minors to be made wards of the court and placed custody and guardianship with the guardianship administrator of DCFS. The permanency goal was set as return home within 12 months.

¶ 10                                    B. The Permanency Orders

¶ 11        Throughout the pendency of this case, the trial court entered a total of 13 permanency orders, which the court took judicial notice of at the termination proceedings (*infra* ¶ 19). The following orders are relevant to this appeal.

¶ 12        In March 2023, the trial court found that respondent had made reasonable progress and changed the permanency goal to return home within five months. Subsequently, in May 2023, the court found that it was in the children's best interests to restore custody to respondent because the children could be cared for at home without endangering their health, welfare, and safety; however, guardianship remained with DCFS.

¶ 13        In April 2024, the trial court found that (1) the appropriate permanency goal should continue to May 2024 but also that (2) respondent had not made reasonable progress or efforts. Specifically, the court stated that respondent "has not made substantial progress in the last 11 months since the minors have been returned to her care."

¶ 14        In May 2024, the trial court found that respondent had not made progress since the children were returned home to her in May 2023. The court determined that placement of the children outside the home was (1) necessary, (2) appropriate for the plan and goal, and (3) consistent with the health, welfare, and safety of the children, as well as in their best interests. Accordingly, custody of the children was transferred to DCFS, which retained guardianship. The

permanency goal was set to return home pending a status hearing.

¶ 15                          C. The Termination Proceedings

¶ 16            In March 2025, the State filed petitions to terminate respondent's parental rights as to each of the minor children. The State alleged respondent was an unfit parent pursuant to section 1(D)(m)(ii) of the Adoption Act (750 ILCS 50/1(D)(m)(ii) (West 2024)) because she failed to make reasonable progress toward the return of the children during the nine-month periods of (1) October 2021 to July 2022, (2) July 2022 to April 2023, (3) April 2023 to January 2024, (4) January 2024 to October 2024, and (5) October 2024 to July 2025.

¶ 17            In August 2025, the trial court conducted a bifurcated termination hearing on the State's petitions.

¶ 18              1. *The Fitness Portion of the Termination Proceedings*

¶ 19            The trial court first conducted the fitness portion of the termination proceedings. At the beginning of the hearing, upon being prompted by the State, the court stated that it was taking judicial notice of the shelter care, adjudicatory, dispositional, and permanency hearings orders.

¶ 20                              a. Megan Liggett

¶ 21            Megan Liggett testified that she had previously worked as a child welfare specialist at Chaddock Foster and Adoption Services (Chaddock) from May 2023 to June 2024. She was familiar with the three children and worked with their parents as a caseworker. She explained that DCFS originally opened the case due to ongoing domestic violence and substance abuse issues. When Liggett took over the case in February 2024, the goal was for the children to remain home with respondent. At that time, the children's father was incarcerated, and respondent was participating in drug court.

¶ 22        Liggett described the service plan that covered January 2024 through June 2024. The plan required respondent to engage in mental health and substance abuse services and cooperate with DCFS. Later, the plan was amended to add a requirement that respondent provide "stability" for the minors. Liggett noted that in October 2023, respondent had completed mental health counseling and continued meeting biweekly with her counselor. Respondent had also completed substance abuse counseling. Liggett testified that respondent was cooperative during this period; she maintained contact, allowed scheduled and unscheduled home visits, signed releases, and kept Liggett informed of changes to her address or employment.

¶ 23        In May 2024, the trial court ordered the children removed from respondent's custody. Liggett stated that the children were removed based on her recommendation that respondent had not made progress regarding the children's school and appointments. She observed that the children were often late for school and had unexcused absences. Specifically, Liggett recalled that in a single month, L.C. was tardy at least nine times and N.C. was tardy at least seven times. When Liggett addressed this with respondent prior to removing the children, respondent explained that the children had a hard time getting up. Respondent stated that because she worked nights, she struggled to wake up to help them get ready, and the responsibility to get the children ready for school fell upon the two oldest siblings.

¶ 24        Liggett also testified that the children missed necessary medical appointments for their dental, vision, and mental health needs. For example, N.C. and A.C. missed eye appointments in St. Louis, Missouri, several times. Additionally, L.C., who was diagnosed with attention-deficit/hyperactivity disorder, went through a period where he could not get his medication refilled because he had not attended the required checkup. These issues did not improve during Liggett's time on the case.

¶ 25 Liggett further described the state of respondent's home as "questionable." Although the home appeared clean, Liggett smelled the strong odor of cat urine during every monthly visit. She noted that at one point, 14 cats lived in the home. Liggett testified that the children's clothes smelled like urine at school, a fact the school also reported to her. Although Liggett discussed this issue with respondent and respondent claimed she had removed the cats or planned to do so, the situation never changed while Liggett was the caseworker.

¶ 26 After the children were removed, the service plan added a new task for "stability." This task required respondent to attend weekly visits with the children without any unexcused cancellations within 24 hours of a visit. Respondent was also required to attend medical appointments, secure her own transportation, and maintain contact with the caseworker. Liggett's involvement with the case concluded in June 2024.

¶ 27 b. Kelsey Platt

¶ 28 Kelsey Platt testified that she began working with the family as their caseworker in June 2024 and evaluated the service plan dated December 4, 2024, which covered the period from June 2024 to December 2024.

¶ 29 In that service plan, Platt rated respondent's performance on her mental health task as satisfactory. She noted that respondent had previously completed mental health and substance abuse counseling prior to Platt taking the case. During the June 2024 to December 2024 period, respondent attended Narcotics Anonymous meetings, received Vivitrol shots to assist with alcohol cravings, and consistently tested negative for substances when tests were requested.

¶ 30 In contrast, Platt rated respondent's cooperation as unsatisfactory due to multiple concerns regarding dishonesty. A primary instance of dishonesty involved the arrest of K.C. for

- 7 -

theft in June 2024. Although respondent denied any knowledge of or involvement in the theft, Platt obtained a police report that indicated respondent knew about the theft prior to it occurring. Respondent was subsequently charged with obstruction of justice regarding the incident, a fact she concealed from Platt; Platt discovered the charge only through the probation officer.

¶ 31　　　　Platt further testified that respondent was dishonest regarding her housing and pets. Respondent moved residences during this period specifically to keep her cats and falsely reported that her previous landlord had approved breaking the lease. Additionally, although respondent claimed she had removed the cats—which had previously numbered 14—Platt observed or heard cats present during three separate visits. Platt described a strong smell of cat urine in the home, which prevented visitation from occurring there. Although Platt acknowledged on cross-examination that there is no specific policy against owning cats, she clarified that the sheer number of animals and the resulting sanitary issues were the basis for the concern.

¶ 32　　　　Platt also rated respondent's visitation task as unsatisfactory. Although respondent attended visits consistently, Platt described them as chaotic. Respondent struggled to step out of a "friend role," despite receiving parenting coaching. Platt detailed instances of inappropriate conversations, including respondent telling the children that her tattoo artist had just gotten out of jail for beating his wife, showing the children her lace bra, and having her daughter count cash from her purse. Respondent also instructed the children to keep secrets from the caseworker and foster parents regarding their father's new relationship. Due to these issues and the children's struggle to regulate themselves, visitation was reduced from four hours to two hours on Saturdays.

¶ 33　　　　Platt observed no significant improvement in respondent's parenting skills

between June 2024 and December 2024. Although respondent attended parenting coaching, she failed to implement the skills provided. Platt remained on the case until February 2025, noting that while she eventually observed a litter box at the home, the strong smell of urine persisted. On cross-examination, Platt acknowledged that respondent (1) was pleasant during meetings, (2) was successfully discharged from mental health and substance abuse services, (3) completed domestic violence victim classes, and (4) eventually completed a financial literacy class after the service plan period ended.

¶ 34                                  c. Judicial Notice of Criminal Cases

¶ 35        At the State's request, the trial court took judicial notice of Adams County case No. 24-CF-434, in which K.C. pleaded guilty on August 26, 2024, to Class 3 felony theft over $500 for an incident that occurred on June 3, 2024. The court also took judicial notice of Adams County case No. 24-CF-426, in which respondent was charged with obstruction of justice, a Class 4 felony, alleging an offense date of June 3, 2024.

¶ 36                                  d. The Trial Court's Parental Fitness Findings

¶ 37        The trial court concluded that the State had proven by clear and convincing evidence that respondent was unfit due to her failure to make reasonable progress during the two nine-month periods of (1) January 2024 to October 2024 and (2) October 2024 to July 2025.

¶ 38        The trial court explained its ruling as follows:

> "The record shows that the date of adjudication of these minors did occur
> in October of 2021. There was a time while these cases had been pending and I
> think the record shows that there was a time period during which the minors were
> attempted or did—were placed back with [respondent] that ended in May of 2024
> and at that time, the minors were removed from [respondent's] home and returned

- 9 -

to foster care and remained there ever since.

* * *

*** The testimony today has talked about following the removal of the minors from the home in May of 2024, the evidence was that part of the reason for that happening was that—two reasons primarily, because of the lack of regular attendance at school of the minors and the lack of attendance at various doctor appointments being two of them.

The statute under [the] Juvenile Court Act [of 1987 (Juvenile Court Act) (705 ILCS 405/1-1 *et seq.* (West 2024))] with regard to neglect does set up certain definitions of what neglect is. One of the definitions is the minors being in an environment that is injurious to their welfare. If minors are in an environment where they have many cats living in and out of the house causing their clothes to smell like the cats and they're attending school that way, that's a problem. If they're not attending school on a regular basis having many instances of tardies or absences, that's also an environment that is not good for the children. And if they have doctor appointments that they are to be attending for health reasons and those appointments are not being made or attended, that's another reason for the Court to find that the environment of the minors at that time, in May of '24, was injurious to this welfare and apparently was part of the reason for the minors being removed, all of those related to, at that time, [respondent's] lack of parenting skills in the home with the minors.

Following May of 2024, there's been testimony with regard to what [respondent's] performance was with regard to services under the service plan,

specifically from May of '24 up through December of '24 and for two months thereafter. During that time, [respondent] was engaged in some services under the service plan. Did have some meetings with the caseworkers. Did have visits with the minors. The visits were always supervised by the agency and were never—there never did come a time when the visits were able to be unsupervised. Some of the visits were not proper visits due to the conversations which [respondent] attempted to engage the minors with, not apparently using skills that had been delivered to her from parenting coaching sessions. Because of that, the number of hours devoted to visits was decreased. There came a time when that was done by the caseworkers.

And there never was any, even though [respondent] had been engaged in services under the service plan during this time, there never did come a time when the caseworker was able to say that [respondent's] parenting skills had improved substantially. No improvement [of] the parenting skills was ever noted by the caseworker, and I believe that that's one reason why the visits always remained supervised. There was no recommendation made that the minors be returned from foster care back into the custody of [respondent].

The—one of the caseworkers testified as to the reports that she wrote for review hearings which the Court had also been asked to take judicial notice of while these cases were pending during these two nine-month periods of time. In those reports, the worker made the assessment and did state in her reports that the children had been in care, that is in the care of [DCFS], first of those reports was in November of '24. The second report was in February of '25. First report noted

that the children had been in care for over [1,200] days at the time of that report and in the next report, the children had been in care for over [1,300] days. And in each of those reports, the caseworker did note that this presented a significant concern to—with regard to the children and needing to achieve permanency and that from the observations being made from the visitations as well as the lack of progress toward [the] return home goal by either of the parents, that on the date that those reports were written, that the children were no closer to returning home than they were when the cases first—when the children were removed from [respondent's] care in May of 2024.

Based upon all [of] that evidence, the Court can find that the allegations of unfitness with regard to [respondent] in the motion ha[ve] also been proven by clear and convincing evidence."

¶ 39          2. *The Best-Interest Portion of Termination Proceedings*

¶ 40          Immediately after finishing the fitness portion of the proceedings, the trial court conducted a hearing on the best-interest portion of the termination proceedings.

¶ 41                              a. Lisa Brandon

¶ 42          Lisa Brandon testified that she was a child welfare specialist at Chaddock and was familiar with the minors. Brandon explained that at the time of the hearing, L.C. was placed with a relative, Adrianna M., and had been in that placement since the children were removed in May 2024. N.C. and A.C. were placed with Amy C., who was also a relative, and they had also been in that placement since May 2024. Although the children were in separate homes, they lived in a duplex structure right next to each other, and Brandon monitored their placements twice a month.

¶ 43 Brandon testified that L.C. was bonded to his foster parent, Adrianna M. Brandon observed that L.C. talked openly with Adrianna M. about his activities and concerns, referred to her as family, and relied on her for emotional support. Regarding his education, L.C. was in sixth grade at Quincy Junior High School, and his foster parent ensured he attended school every day. Brandon also noted that L.C. saw a therapist at least every four weeks and Adrianna M. ensured he attended those appointments. Besides vision care, L.C. had no other medical or unusual issues in his placement.

¶ 44 Regarding N.C. and A.C., Brandon testified that they were bonded to their foster parent, Amy C., and Brandon had observed both children hugging Amy C., speaking highly of her, and reaching out to her with any concerns they had. Both girls attended Denman Elementary School, were academically on target, and attended school regularly without concern. Brandon stated that neither child had mental health issues, but both had vision needs requiring them to wear thick glasses. Amy C. ensured that they attended all necessary medical appointments.

¶ 45 Finally, Brandon confirmed that both foster parents had shown a willingness to adopt the children and had signed permanency commitment forms to that effect.

¶ 46                                     b. Respondent's Argument

¶ 47 Respondent did not present any evidence, and her counsel made the following argument against termination: "Your Honor, I just really[,] my argument at the end of the termination hearing, Your Honor, I mean, we are seeing the reasonable progress that [respondent] is making, Your Honor, so we're asking the Court to find that [the] State has failed to meet its burden. Thank you."

¶ 48                                     c. The Trial Court's Decision

¶ 49 The trial court found that it was in the best interests of the minors to terminate

respondent's parental rights. The court explained its findings as follows:

"The current caseworker has testified as to the living arrangements for the minors. Minors are ages 12, 10, and 7. All the minors are placed with relative foster placements and have been continuously since May of 2024. There are two— apparently two separate foster homes, both relatives, that are in close proximity to each other so the minors are in contact with each other. The minors appear to be bonded to their foster parents. The homes appear to be safe and appropriate [for] the minors. All their needs, including any special needs, are being met in those foster homes. The homes are considered preadoptive foster placements by relatives due to the commitments which have been made by the foster parents.

There has not been any evidence presented to show what relationship, if any, currently exists between the minors and any of the natural parents. Also, no evidence has been presented to show that either of the natural parents would be able to provide a stable residence for any of the minors at any time in the near future.

There is a plan in place with the agency to have the minors be adopted by their respective foster parents. This does appear to be the best plan for these minors to achieve the permanency which is required by the Juvenile Court Act.

The Court today would not be in a position to trade the certainty of the permanency for the minors through the current plan in place with the agencies for the uncertainty of possibly some unknown date in the future when the minors might be able to return to the custody of the natural parents. We don't know what that date is or if that would occur. It would be some uncertain date. The Juvenile

Court Act requires that permanency be achieved for minors as soon as that can be done in a practical way. It does appear that that requirement of the statute could be met through the plan that is currently in place.

The burden is on the State on this issue to prove by a preponderance of the evidence that it would be in the best interest of the minors to have the rights of the natural parents be terminated. The Court would find today that the [State has] met that burden not only by showing by a preponderance but by the overwhelming evidence that it would be in the best interest of these minors to have the rights of the natural parents be terminated."

¶ 50        This appeal followed.

¶ 51                              II. ANALYSIS

¶ 52        Respondent appeals, arguing that (1) the trial court's fitness findings were against the manifest weight of the evidence and (2) trial counsel provided ineffective assistance during the best-interest portion of termination proceedings. We disagree and affirm.

¶ 53                    A. Parties Should Stop Discussing "Evidence"

                        Presented at Permanency Review Hearings

¶ 54        As an initial matter, we note that respondent dedicated four pages of the statement of facts in her brief to evidence from the permanency review hearings—not merely the trial court's permanency orders, which the court had taken judicial notice of. Throughout her arguments regarding the trial court's fitness findings, she repeatedly cites transcripts from those hearings. However, as we have repeatedly stated in other decisions of this court, the evidence presented at permanency review hearings is immaterial to a trial court's fitness finding. See, *e.g.*, *In re G.P.*, 2025 IL App (4th) 241576-U, ¶¶ 91-92; *In re K.S.*, 2024 IL App (4th) 240534-U,

- 15 -

¶ 43; *In re E.N.*, 2024 IL App (4th) 230776-U, ¶ 44; *In re Dar. H.*, 2023 IL App (4th) 230509, ¶¶ 45-46, 49; *In re M.D.*, 2022 IL App (4th) 210288, ¶ 81. Respondent's inclusion of a detailed summary of those hearings in the background section to contest the fitness findings wastes the time of both this court and the litigants.

¶ 55 Regarding this point, in *Dar. H.*, 2023 IL App (4th) 230509, ¶¶ 45-46, 49, we wrote the following:

"Because evidence presented at hearings other than a fitness hearing, like permanency review hearings, is generally not subject to the rules of evidence, a discussion in an appellant's brief of the evidence presented at a permanency review hearing, as well as any remarks of the trial court regarding that evidence, is a waste of both counsel's and this court's time.

We reiterate that a trial court's fitness findings made after it conducted a hearing on a petition to terminate parental rights are to be based solely on the evidence the court heard at the fitness hearing, *not* on any evidence that may have been presented at other hearings that preceded the fitness hearing.

\* \* \*

Because of the different evidentiary rules governing fitness hearings and permanency hearings, evidence and orders from permanency hearings may not be considered by a trial court at the fitness portion of the termination proceedings. [Citation.] Similarly, this court will not reverse a trial court's fitness findings based on evidence presented at the permanency hearings; instead, we review the trial court's findings based solely on evidence presented at the fitness hearing." (Emphasis in original.)

¶ 56                                    B. The Trial Court's Fitness Findings

¶ 57            It is well settled that "[b]ecause each of the statutory grounds of unfitness is

independent, the trial court's finding may be affirmed where the evidence supports a finding of

unfitness as to any one of the alleged grounds." *In re Adoption of P.J.H.*, 2019 IL App (5th)

190089, ¶ 11. Based on our review of the record, we conclude that the court's finding that

respondent failed to make reasonable progress within the January 2024 to October 2024 nine-

month period was not against the manifest weight of the evidence. Accordingly, we discuss only

that finding.

¶ 58                              1. *The Applicable Law and Standard of Review*

¶ 59            The State must prove unfitness as defined in section 1(D) of the Adoption Act

(750 ILCS 50/1(D) (West 2024)) by clear and convincing evidence. *In re N.G.*, 2018 IL 121939,

¶ 28. Section 1(D)(m)(ii) of the Adoption Act defines an unfit person as a parent who fails to

make "reasonable progress toward the return of the child" during any nine-month period

following an adjudication of neglect or abuse. 750 ILCS 50/1(D)(m)(ii) (West 2024).

> "Reasonable progress is an objective review of the steps the parent has taken
>
> toward the goal of reunification and examines the demonstrability and quality of
>
> those steps. [Citation.] Reasonable progress exists when the trial court can
>
> conclude that, in the near future, it will be able to order the children returned to
>
> parental custody." *Dar. H.*, 2023 IL App (4th) 230509, ¶ 53.

¶ 60            The determination of parental unfitness requires factual findings and credibility

assessments that the trial court is in the best position to make. *In re M.I.*, 2016 IL 120232, ¶ 21.

Accordingly, we will not reverse a trial court's finding of parental unfitness unless it is against

the manifest weight of the evidence. *N.G.*, 2018 IL 121939, ¶ 29. A decision is against the

manifest weight of the evidence when the opposite conclusion is clearly apparent. *Id.*

¶ 61                                    2. *This Case*

¶ 62          The trial court's finding that respondent failed to make reasonable progress toward the return of the minors during the nine-month period of January 2024 to October 2024 is well supported by the record. Because we conclude the court's finding regarding this specific nine-month period was not against the manifest weight of the evidence, we limit our discussion to the evidence and findings relevant to that time frame.

¶ 63          Regarding this period, respondent argues that she made substantial progress toward the return of the children. She notes that she (1) maintained long-term sobriety, (2) maintained full-time employment, (3) completed substance abuse and mental health counseling, (4) was successfully discharged from Clarity Healthcare, and (5) received a satisfactory rating for cooperation due to her consistent communication. Respondent emphasizes that the children remained in her care for nearly half of the relevant period (from January 1, 2024, through May 16, 2024), which she claims shows that the trial court and agency viewed reunification as safe and appropriate for that duration. She attributes the subsequent removal, based primarily on school tardiness and missed medical appointments, to confusion regarding scheduling and communication issues rather than parental deficiency.

¶ 64          Respondent measures her progress solely from the initial conditions that brought the children into care. However,

> "the benchmark for measuring a parent's progress under [the Adoption Act] must take into account the dynamics of the circumstances involved; the reality that the condition resulting in removal of the child may not be the only, or the most severe, condition which must be addressed before custody of the child can be

returned to the parent." *In re C.N.*, 196 Ill. 2d 181, 216 (2001).

Reasonable progress "encompasses the parent's compliance with the service plans and the court's directives, in light of the condition which gave rise to the removal of the child, and *in light of other conditions which later become known* and which would prevent the court from returning custody of the child to the parent." (Emphasis added.) *Id.*

¶ 65　　　　In the present case, the trial court noted that the children were removed again from respondent's care in May 2024 primarily "because of the lack of regular attendance at school of the minors and the lack of attendance at various doctor appointments." The court further found the environment injurious because the children were living "in an environment where they have many cats living in and out of the house causing their clothes to smell like the cats and they're attending school that way." The court noted that after May 2024, respondent's visits were reduced because she did not apply the skills she learned during her parenting coaching sessions and had inappropriate conversations with the children. The court found that respondent failed to substantially improve her parenting skills.

¶ 66　　　　As we have noted, the record supports the trial court's findings. Caseworkers addressed these specific issues with respondent, yet she failed to correct them. Specifically, she failed to ensure the children attended school on time, maintained their hygiene, and attended medical and dental appointments. Coupled with respondent's unsatisfactory ratings on her service plan goals, her repeated dishonesty with caseworkers, and the commission of a criminal offense while on probation, the court's finding that she failed to make reasonable progress from January 2024 to October 2024 was not against the manifest weight of the evidence.

¶ 67　　　　　　　　　　C. Trial Counsel's Representation

¶ 68　　　　Respondent also argues that she received ineffective assistance of counsel when

her attorney failed to present any evidence to show that terminating her parental rights would be against the children's best interests. In addition, she asserts that her counsel provided ineffective assistance because counsel did not attempt to challenge the evidence the State provided regarding those interests. We disagree.

¶ 69        1. *The Applicable Law and Standard of Review*

¶ 70         a. The Best-Interest Finding

¶ 71    After a finding of unfitness, the State must prove by a preponderance of the evidence that it is in the child's best interests to terminate parental rights. *In re D.T.*, 212 Ill. 2d 347, 363-66 (2004); 705 ILCS 405/2-29(2) (West 2024). "[A]t a best-interests hearing, the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *D.T.*, 212 Ill. 2d at 364.

¶ 72    When determining the best interests of a child, a trial court must consider the factors set forth in section 1-3(4.05) of the Juvenile Court Act (705 ILCS 405/1-3(4.05) (West 2024)). See *In re T.A.*, 359 Ill. App. 3d 953, 959-60 (2005). Those factors include: (1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's familial, cultural, and religious background and ties; (4) the child's sense of attachments, including where the child feels loved, attached, and valued; (5) the child's sense of security, familiarity, and continuity of affection; (6) the child's wishes and long-term goals; (7) the child's community ties; (8) the child's need for permanence; and (9) the uniqueness of every family and each child. 705 ILCS 405/1-3(4.05) (West 2024).

¶ 73        b. Ineffective Assistance of Counsel

¶ 74    A parent asserting a claim of ineffective assistance of counsel in a juvenile abuse and neglect case "must show that her counsel's performance was both deficient and prejudicial."

*In re Baby Boy*, 2025 IL App (4th) 241427, ¶ 87. An attorney's performance is deficient when it falls "below an objective standard of reasonableness." *In re A.P.-M.*, 2018 IL App (4th) 180208, ¶ 40. To show prejudice, the respondent must show that "but for counsel's errors, there is a reasonable probability that the result of the proceeding would have been different." *Id.* ¶ 41.

¶ 75                                                    2. *This Case*

¶ 76          Respondent argues that she was denied effective assistance of counsel during the best-interest hearing because her attorney failed to present any evidence or argument to contest termination or to show that termination was contrary to the children's best interests. However, she fails to state what additional witnesses or exhibits counsel should have presented at the hearing. Regarding her claim that counsel should have presented a more robust argument, she also fails to articulate how additional argument highlighting the statutory best-interest factors would have created a reasonable probability of changing the outcome of the hearing, or even how counsel should have specifically argued those factors.

¶ 77          We note that at the time of the hearing, this case had been ongoing for over four years, and the children had been removed from respondent's custody on two separate occasions. During that time, the children were placed with relatives who were willing to adopt them. The record established that their needs were being met in these placements and that termination would provide them with much needed permanency and stability after years of juvenile proceedings. Respondent has not identified what additional evidence could have been presented to undermine these findings. Furthermore, she has failed to articulate how any specific evidence in the record, if argued more forcefully by counsel, would have created a reasonable probability of changing the outcome of the hearing. Accordingly, respondent's ineffective-assistance argument fails.

¶ 78                                III. CONCLUSION

¶ 79        For the reasons stated, we affirm the trial court's judgment.

¶ 80        Affirmed.